Very well, Your Honor. May it please the Court, I'm David Becker for Appellant's Klamath Siskiyou Wildlands Center and Klamath Forest Alliance. I'm going to try to reserve five minutes of my time for rebuttal. The Siskiyou Crest, where this project takes place, is an area of unique biological diversity. Its fragile wetlands and soils are home to hundreds of endemic and rare plant species. Along the Siskiyou Crest, there are four protected biological areas, and the region has the highest concentration of intact wetlands and watersheds in the Pacific Northwest. And what I'd like to focus on are two ways in which the environmental assessment for the Oak Knoll Project violates NEPA by not taking a hard look at the resource damage that cows trespassing across the crest cause on the rogue forest, and by not providing a convincing statement of reasons why an environmental impact statement should not be prepared, and also briefly touch on the NIFMA issue. The evidence in the administrative record is that grazing on the Siskiyou Crest and its fragile soils and wetlands causes significant damage to riparian areas and to the soils that host many of the species of plants that are endemic only to this particular region. For example, the rogue forest has chronicled almost 15 years of damage that has been caused by Klamath cows coming over. At ER 124, for example, they point out that livestock grazing is detrimental to riparian areas because it results in stream bank trampling, it results in soil... Can I ask a dumb question? Yes, your honor. You'll quickly know the answer to it. You know that they're Klamath cows because they're tagged in some way? Yes. Okay, and that's how... because there are cows that can graze lawfully on the rogue side, right? Do you know the damage that's being caused by the Klamath cows, those bad cows that want to stray? I mean, because they're tagged, is that how people tell the difference? That's the main reason that they tell. Well, you don't know who's causing the damage, but what you know is there are more cows rather than less cows because of the drift. The... I think there are two parts to that. If I could answer Judge Watford's question. The reason I... because you just said the Klamath cows have caused all this damage, and that's why I was asking. How do we know that the Klamath cows as opposed to the rogue cows, what you're going to say? I think first the practical answer is yes, they're tagged with ear tags on the cows. Some of them are branded. Well, you know there are Klamath cows there, but how do you know they're causing the damage? Because many of the areas where the damage has been caused, along in the McDonnell Basin area, the McDonnell Peaks Botanical Area, those have been closed to grazing by four Klamath permittees for 15 years. So, and the field observations in 2007, 2008, 2009 went into those areas and identified which cows were present. There were no Klamath... there were no rogue cows present in those areas. Because they're not allowed to graze in those areas. Yeah, and I think historically, going back to the 1990s, there was trespass from both forests onto the other forests. So, rogue cows were getting into the Klamath 20 years ago, but because of the restrictions, because the rogue shut those areas around McDonnell Basin, Monogram Lake, the McDonnell Peak Botanical Area, to its own permittees, the evidence that's in the record, mostly again the very, very detailed field reports from 2007 to 2009 that appear in the excerpts of record at 178 to 211, identified Klamath cows and in fact the volunteer, a former rogue staff officer, presented the methodology that he followed for identifying which cows were from either the Klamath permittees or the rogue permittees. So, you don't have a problem of the rogue cow strain into areas where they're not supposed to be? Is that again how we know it's all the Klamath cows fault that's damaged? In the recent years, there is not that problem, yes. There's no recent documentation, recent being the three years before the decision, 2007, 2008, 2009. There's no evidence of the rogue cows getting into the wrong places or getting into areas that have been closed for them. All of the evidence from that period is of Klamath cows getting into those riparian areas. And as the record shows, these cows were, in the mid-90s, the rogue was identifying that the damage caused by the Klamath cows was leaving these riparian zones in degraded condition. There was an environmental assessment of grazing on the rogue side in 1996 that found that the degree of unauthorized use by Klamath cows over the ridges of the McDonnell Basin area were threatening the viability of the rare Howells-Towsha, which only has a few populations left anywhere in the world. And at ER 290, the environmental assessment looks at the impacts to special interest areas, the biological protected areas on the Klamath side, and it notes that the cows will move through these areas of very, very loose soil where most of the endemic plants that are of concern in the forest live. These are not forage plants. These aren't grasses. So the cows don't eat them, but they move through there as they're moving from the Klamath side over into the rogue area. I asked this just about the numbers, because I'm confused about this. And you're going to tell me I'm wrong on this. I came away with the impression that if we put aside the 2009 aberrational year, the rest of the years, it seems like there's 20, 30 cows in a whole year that are getting across. And I just, my gut-level reaction was, how much damage can 20 or 30 cows cause? But you're going to tell me that the numbers are much greater or that that small number of cows can, in fact, cause huge amounts of damage? Your Honor, I think I'll tell you both of those things. There's really no evidence that 2009 was an aberration. It was the highest number of cows that had ever been documented, over 200. If you look at ER 182 to 184 and then the subsequent end-of-year numbers at 378 and 379, then in 2010, there were at least 61 cows that were in the rogue forest that were Klamath cows. And a couple of other instances where there weren't counts. But you say it was not an aberration? Pardon? You said that data shows that 2009 wasn't an aberration. It's the, there's an assertion that 2009 was an unusually dry year. That is not in the record anywhere. The record shows that there's been a drought in this area for pretty much the last 15 years. But it dropped to 61 and 22? 61 plus a couple of other instances where they weren't able to, where they didn't provide any information. No, that's just, the decision was from December of 2010. So 2010 is really the last year. But the analysis was that there was a peak. I mean, there was high numbers at some point. And then given the, whatever remediation was attempted over the years, there was a decline. And then what they're coming up with now is ways to improve the surveillance and the corralling and all of that, and monitoring and mitigation. So I'm not sure I've heard why, what's wrong with what they ultimately concluded in their judgment. I think two points, and I think this will answer Judge Watford's question also. The efforts that were being made to reduce over the years, imposing the Siskiyou Crest Range Management Strategy that started in 1994, and has essentially been recycled in the new decision, were in effect when that peak occurred. So it's not the fact that the number of cows trespassing has been reduced. What were they before? What was the data before 2009? In 1991, there were between 50 and 150. What was the highest peak pre-2009? The highest that I can find in the record was somewhere between 50 and 150 in 1991. So even before the beginning of the environmental assessments. That was in 91. That was in 91. That's the only data before 2009. There is some other data. I think the important point is, and I would say also that ER 181, there's evidence that even 15 cows or even 10 cows getting into a riparian area can cause damage and can cause it to not be able to recover. Most importantly, the continuous number of cows that have been trespassing onto the Rogue for the 15 years before this kept those areas on the Rogue side closed to the Rogue permittees. The damage was still so substantial, the recovery had not occurred, because even the small number of cows were causing enough damage. The Rogue couldn't reopen those areas to its own permittees for grazing. And I think the more fundamental point here is, none of this data is in the environmental assessment or the rangeland specialist report. There's no figures given as to the number of cows that have trespassed. The information that's readily available from the field studies in 2007 to 2009, the memorandum that the Rogue wrote to the Siskiyou, to the Klamath in 2002, the earlier environmental assessments that showed the significant damage on the Rogue side, none of it. The plan that was adopted essentially says, I'm trying to find the exact language I'm not finding it, but it said something to the effect of, if this doesn't work by 2013, to essentially no drift, we will take steps that will. Something to that effect, right? Yes. So, why isn't that essentially, I understand that you say they don't dope. I mean, that they don't actually do what they say they're going to do. But this is a planning document, right? And I don't know that you get to criticize it on the ground, or maybe even tell me why you do, that it's not actually going to happen. But if it actually did happen, isn't it sort of self-definingly going to eliminate the impact? Well, I think that's in tension with the obligation under NEPA that when, as they have here, issued a finding of no significant impact based on the mitigation steps that they're planning to take. But I thought the no significant impact is with regard to the plan they're adopting. What we're planning to do is not going to have any significant impact. Right. And they're saying that we are going to do these things which should, by 2013, reduce the drift to essentially nothing. And if it doesn't, we'll see that it does. Is that what they're saying? So. That's essentially it, yes. So, why isn't that, by definition, a no significant impact? Because they still would have to show that the mitigation is going to be effective. The cases such as the National Parks and Conservation Association, the Babbitt case, when you rely on mitigation to make a finding of no significant impact, you have to have an evaluation of why it's going to work. Well, you're calling it mitigation. You're calling it their plan. Right. I mean, I'm not sure why it's mitigation. The problem is that you have to have, there's possible drift, but according to them, there's not going to be drift because we're going to stop it. Entirely. They seem to be saying entirely. And, again, they have to have facts and analysis to support why that is actually happening. But how is all of the material that you're saying isn't there? I mean, they seem to be conceding the damage. I mean, they're going to stop the cows. Now, maybe they're not going to stop the cows, but how is knowing more about the absolute actual damage they will cause if they don't stop the cows going to change your assessment of this plan? I think I would say that under NEPA, when they're relying on this plan to avoid these significant impacts, they do bear the burden of showing that it is going to be, that it's actually going to work. That's one of the critical aspects of a mitigated finding of no significant impact. If they're relying on mitigation, they have to evaluate why it's going to work. And they haven't done that. There's simply a listing of the steps they're going to take and then the possible additional mitigation measures. But there's no analysis anywhere in the EA of why it's going to work. And in fact, in this case, it runs counter to the facts in the record because the plan is essentially the same as the one they've had before, that for 15 years before the decision, failed to prevent this impact. It failed to prevent 200 cows from going across into the Rogue Forest. There was an annual operating instruction in 2009 that required the permittee to check for cows on the Rogue every two weeks. Could you address the cumulative impact analysis? Yes, Your Honor. The cumulative impact analysis does not include any effects on the Rogue Forest. So it's not evaluating the amount of damage that the Klamath cows are causing on the Rogue when added to the other impacts that are existing within the area affected by the grazing. That's what I thought. Now, you at the beginning said you were confident that the rogue cattle weren't getting into these dangerous areas. So how does that affect your argument on cumulative impact? Because there are impacts from logging, for example, in this area. There are impacts from off-road vehicles. There's even impacts from pack stock that are getting up into these areas. And so the damage that the Klamath cows are causing on the Rogue side needs to be evaluated in the context of the other damage that's occurring in that area. So in that, your argument is that that goes to the Towsha's, the flowers' well-being. That's the focus of your concern? It is, and the other endemic. Is there any evidence that these other factors have impacted the flower area? Not in the administrative record, but that may be a function of the fact that they didn't evaluate beyond the border. And present any of these other sources. I thought your focus was on the cattle as the problem. It was. And there are scattered statements in the record about other impacts. The same cumulative impacts that are present on the Klamath side would presumably be also on the Rogue side if they looked at it. Just very briefly on the NIFMA issue. This is a situation where a site-specific action has to be consistent with the forest plan. And here, the forest plan only found 3,385 acres of land suitable for grazing by definition under the regulation. My understanding of what they're saying is because that's all suitable for grazing, that's the only place they're going to graze, but they have to go between one and the other. So when we say they can graze in 48,000 acres, they're not really going to graze  But in the 44,000 acres that are unsuitable by definition, that's areas where grazing through that area where there's no grass, but when the cows are moving back and forth, is going to cause damage. In fact, the regulation says it will result in substantial and permanent impairment. And so it's arbitrary and capricious to authorize grazing on 48,000 acres when only 3,000 acres are suitable without providing a rationale. And in this case, the error of the district court was to supply a rationale. The agency itself hadn't. I'll reserve my time. Thanks. Thank you. May it please the court. I'm Evelyn Ying, representing the Forest Service and several of its officials this morning. Before I specifically address some of the issues that the plaintiffs raised today, I wanted to just make a couple points that I think are really important. First, this case concerns the reauthorization of livestock grazing on public lands that have been continuously grazed for over a century with a couple of substantive changes. And the only substantive changes are that there's an additional protective resource protection measures and mitigation measures. So that is the only change here. One of the complaints, which I must say I was skeptical about, but I can't find anything to refute, is that you never, the plan adopted doesn't actually say how many cows are going to be grazing or what. The scope, the adequacy of the EA and just explaining what is happening, the level of grazing here. It says that the number of livestock will be determined yearly as part of the adaptive management plan. The season of use will be based on results from range readiness checks conducted prior to turn-on and utilization levels monitored through the grazing season, essentially. And I think the district court said that that was tied to the current usage, but I didn't see any place where it was tied to the current usage. So it doesn't say anything about how many cows there are going to be. And that, I guess, impacts the drift question because if you don't know how many cows are going to be there, you don't know how many are, like, going to drift. The EA, if you read it as a whole and expressly, actually, it does state how many, the level of grazing, that it would be the same. If you look at. I looked everywhere that was cited and I couldn't find it. Okay. Excerpts of the record at 283, it states that the proposed action does not propose longer grazing seasons or greater numbers than has existed under the current permit. And then later on, it talks about, it gives tables in both the rangeland specialist report and also the environmental assessment. For example, in excerpts of record 271 and 445 that specifically state and gives a list of the number of cowherds. I think it's just above on the same page. The sentence you read, I see what you're talking about. It says, I'm sorry, I don't have it in front of me. But on 283. I just read you on 283. Alternative 2 does not propose. Alternative 2 is the proposal. That's correct, your honor. Does not propose longer grazing seasons or greater numbers than has existed under the current permit. That's the language you just quoted. Yes. And I think that makes it clear that there is a cap. The parameter is that the grazing on this project will not exceed those numbers that are currently there. That doesn't, I mean, that maybe gets you a little baby step toward where you want to go. But the fact of the matter is, according to the plaintiffs, is that the current levels have caused this damage. And so I don't, I mean, sure, you're not making it worse, right? But you're not doing anything if you're just keeping the levels the same to ensure that that damage is going to be avoided. Well, a couple of responses. First of all, those levels can go down. They can't go up, but they can go down depending on the adaptive management measures. So if we, if the Forest Service determines that it's necessary to reduce those, to be protective of the environment, they'll do so. But we know that the parameters, and that's what adaptive management is, and that's why it makes sense not to have exact figures except yearly in the annual operating instructions, not to have exact figures of how many cows and when the seasons. But we know for a fact that from the reading of the environmental assessment that it won't exceed the levels, but it might go down. And second of all, the heart of this case, obviously, is the impacts to the, that the cattle drift have here. And that was very, considered very carefully by the Forest Service in this case. And there are many, many factors that I wanted to kind of clarify about that. The first one is that it's obvious that it was considered because it was considered a significant issue here. That doesn't mean that there's significant effects, but that the Forest Service was focusing on this issue with this project. In fact, all the alternatives consider that to be an issue. And the design and the alternatives that are part of this project focus a lot on the drift. In fact, three of the alternatives that didn't consider also focused on the drift. But my understanding, you certainly focused on the drift. It was, you said a lot about the drift in this document. But the complaint seems to be that what you didn't say anything about, or you just about didn't, is the actual impact on the environment of the drift in the other forest. I think we did in the sense that we, first of all, we made clear that the key indicators for this issue would be frequency and duration. So the first thing that is important to know is that how often do the, how often is the drift, and how often. It's all about the amount of the drift, but it's not about the impact of having these cows in the place where they've been and maybe will continue to be if the factors don't work. In other words, there was no description of the riparian effects or the effects on botany or anything, any impact of the cows in the rogue forest. And the reason why that is, is first of all, when you look at the, first of all, let me just answer that quickly about that. When you look at the time they're over there, and there is a statement that says there's minimal impact of the cows going over to the rogue, that because they are there for a very short period of time, and the permittees have been compliant in getting them back when they do drift. So that's one point I'd like to make. The second point is that for a long time, since the 1990s, that when drift was happening even more than it is now, it has substantially been reduced. But that we have asked, or the Klamath has asked the rogue whether or not for some quantitative data on the environmental impacts of the rogue. Sure, there's numbers about the drift, but the pure fact that there's just numbers of the cattle doesn't mean that there is adverse environmental impact here. And if you look at, there's a number of places where the Klamath did request information from a rogue and was not provided. It goes back into both of the range land management specialists. I wondered about that. I mean, what is the obligation there in terms of, if there's an impact outside of the physical confines of an area which is being governed by the plant, is there an obligation to do something other, to actually do the environmental investigation or just to find out what's already been done by others? I don't know the answer to that. Well, in this case, the agency had determined that there was no, that it's minimal impact. So just to talk about getting information, and they requested from the forest. You just said it asked for information, it didn't get it. I mean, the only basis for saying there's a minimal impact, I gather, is that there weren't that many cows. But as to actually going over there and looking to see what was happening, there's no representation that that was done. And I'm asking, do they have any obligation to do that? Well, during that time period, no. They have an obligation to figure out whether or not the impacts of the drift cattle are on the brogue here. And I believe that they did that by figuring out how often that the drift happened. And as Judge Swetford said, some of this information that was provided about the adverse impacts was not environmental impacts, but it was, you know, based on the fact that it's not even clear if they were the brogue cows or the Klamath cows. And lots of, there is no information to show that there's actually adverse environmental effects. In fact, I think it's. On whose burden is the lack of information? That's what I'm trying to ask you. If there isn't adequate information to know, you know there are some cows going over there. You know that cows can cause problems. So on whose burden is the lack of information? Does the forest have some obligation to find out how many cows there are and what are they doing and what does it look like on the ground? And are the rare flowers, in fact, being trampled? Or can they simply ask the other forest and when they don't get an answer say, we didn't get an answer. Well, I think that they first start out with the first, to ask the other forest because this is their forest and they don't adhere. I think it's important to know that the brogue did not object to the project at all, did not indicate that there are any adverse environmental effects or likely to have any adverse environmental effects of the cattle drifting to the brogue. And, therefore, that kind of focuses more on the fact that there is no data. There's no quantitative data that shows that there's actually adverse environmental effect. I think it's important, first of all. The reason why you do a NEPA statement is to find the information. That's what's bothering me. You're saying there's no quantitative information, but there's no one to look for any quantitative information. But, Your Honor, they did try to look for it and they found that there is no information. By asking the other forest, but not by going there themselves and saying, what's going on here? They have that information, but that's why we're doing the, the Klamath is doing the monitoring right now. To see, first of all, if there are any cattle that drift from the Klamath to the brogue. And so there, and the fact is that there are issues that if you look at the record, you can see that there, that there weren't even doing any monitoring over in the brogue as to the adverse environmental effects during the time period of the 1990s anyway. Wasn't there, wasn't there someone from the brogue who, I can't, I just can't remember the details now that came forward and had some information that the, I don't know if it was even the brogue people said, well, he doesn't speak for us or something like that? Yes. There was a district ranger from the, from the brogue that basically said that the, the items, the reports that the plaintiffs are primarily relying upon does not represent the, the position of the brogue. And therefore, and in any event, that, those, those reports. But wasn't that information, though, that did document, contrary to what you were saying a minute ago, that there was damage being done and it sounded like the forester will. Well, first of all, there's two things. The damage that they, they contemplate, that is based on anecdotal information. And it's also based on observations that are not based on scientific protocols or, for example, they include photos of, of the area. And we don't know if they're the rogue cows or if they're. We don't know if they're, if, if that happens, if there are, there's one email that says that they might be horses in the area. Back to the question of, I mean, we've seen a lot of environmental impact statements here, usually. I mean, often, what happens when you actually do an environmental impact statement, I gather, is you go and you find out, or at least you try and find out. You get studies done just to find out how many cows are there and what are the cows doing and are these flowers actually getting trampled and so on. And you don't say, and so not having the information at the outset before you make any attempt to find out is not, I don't believe is an answer, is it? It is here in this particular case because there has been, most of the action is obviously on the climate. And there are, the EA is very clear and very thorough about discussing the effects of that, of the cattle on the different areas on the, on the climate. And. Exactly. And not on the road, even though. Your Honor, that's because there is no evidence of environmental, adverse environmental impacts from the Klamath cows on the road. How do you respond to your opponent's statement that they've actually documented that it's the cows with the Klamath tags on the ears doing the damage and that the, in fact, the rogue ones never get there because those areas have been shut off to their own permittees? Well, first of all, we, the agency did consider those reports. And they, they, and as the district court found, those reports are based, again, on anecdotal information, personal observations. They are not based on scientific protocol. The second thing is that there's nothing that, and they're not based on the position of the rogue. So the rogue hasn't provided any environmental information on themselves of the effects, the adverse, if any, on, of Klamath cows on the rogue. Well, I mean, that is just, then we just have two forests that aren't doing what they're supposed to do. I don't see why, why continue to say the rogue hasn't done it as an answer to anything. Well, there, Your Honor, I think, first of all, it's important to note also that what the rogue, all the different documentation that occurs, first of all, it's not enough. They were focused more about the impacts of the cows drifting over on their permittees. So it wasn't, it wasn't that they were focused on environmental effects, because they didn't say that there were any environmental effects. They were. Who's they? The, the rogue. Okay. So the rogue is, is concerned mainly, and most of the, the citations to communications of the rogue are about their effects on the permittees. That the cows are going to go over there and use their lands, and therefore, it reduces the time that, or the foraging that's available to the rogue cows. That's what they were concerned about. There is nothing that talks about the environmental damage or the adverse environmental effects. It's more of a management issue. My understanding is that that's exactly what's being complained about. That there is nothing that talks about the environmental damage. It could be that there is no environmental damage, or not, certainly not any that rises to significant effect. But this, this. And that's our position, Your Honor, is that we're. In the, in the document, is there any demonstration, anybody went to a book? I'm sorry. That anybody went to find out? Oh, to, to actually request the information. Oh, to look. To find out whether there was any environmental damage at the forest. In, in the rogue forest. During that period. Well, those are the reports from the volunteers. Those are, I imagine that they have folks that look out and, and, and monitor their, their, that, the forest, the, the rogue forest. And so there is documentation in that sense. The fact that there is a dearth of information, I think, is significant in showing that there, that the impacts were minimal, if any, on the environmental effects here. Well, can I, can I ask you just to address the, the conference call notes? Because that just has cast, in my mind at least, I don't know what to do with that. Because it makes it sound, we need to be careful with what we say. There's a recognition that we have a problem. We have not gone out, as Trish Berzon was alluding to, to figure out on the ground what's going on. And so, I mean, there's just this alternative. Perhaps we should say this. Well, perhaps we should admit that this is going on, but it's only going to be temporary. I, I guess I'm not sure what to do with, with those notes. Are you talking about the statement by the rangeland specialist? I think she explained that in her, her declaration. That it wasn't certainly not to downplay the, the effects of this, of the issue. But in effect, it was to kind of heighten the awareness that this is an important issue. And that we need to be careful about explaining this. And also that we need to be. Let me do the part that bothers me. Because I, I do want to hear what the benign explanation for this is. She says we need to be careful. I don't know if it's he or she. We need to be careful about how to deal with the rogue issue. We, we know the drift is occurring. But we need to be careful with what we say. Perhaps say something like, we know there is drift. But there is no confirmation of any environmental impacts attributable to drift. Perhaps there are some effects. But they are probably not necessarily long term. Nor degrading the system due to the nature of sporadic drift. There's kind of this, perhaps we should say this. Perhaps we should say that. We don't really have an explanation. So we've got to come up with something. I guess that's the spin I put on that. Well, that's not, that's not the, what is stated in the declaration. It's, again, the, the reason why is that it, first of all, this is like double hearsay. I mean, it's somebody's notes about what she said. And then, but she, she. Somebody said what we're talking about. Yes. Stephanie McMorris. The Rainshot Specialist. But she's very clear in her declaration that she didn't want to downplay it. In fact, she wanted to make sure that it was clear that this is an issue that was, had a lot of public interest. And therefore, that's why the Klamath spent a lot of time and said that this was a significant issue. That she wanted to make sure that, that it was properly addressed. And also that they wanted to take time to make sure that they understood the difference between short-term impacts, which is, and long-term impacts. Now the short-term impacts, like I was alluding to, is that they go over to the Rogue. They're over there for a short time period. And then they are, the permittees get them back. And therefore, there are no long-term impacts. And the short-term impacts, as with grazing that's been evaluated in the EA. That doesn't prove environmentally that there's no long-term impact. They could be there for four days and eat all of these plants, and then there were no more plants. Right. Certainly that could be the case. But there's no evidence of that, Your Honor. That's what I keep coming back to. Who's supposed to get the evidence? Well, we are actually, the Klamath is actually. Is there any indication in this document that anybody went to look, went to find out, made any attempt to see what the actual impact of these cows was in this farm, in the other farms? In the actual. In any way at all? I think. Photographs, scientific studies, anything. But, Your Honor, it would be a bit much to have in the sense that the forest itself, the rogue, is saying that there is no adverse environmental impact. To have them go out and. Just a minute. I didn't think you said that. I thought you said that there was no information. There's no information. Where's the rogue saying there's no impact? They're saying, well, there is no information. You're right, Your Honor. What they're saying is that, again, that this is a permit management issue. That what they're, when they talk about resource concern, they're actually talking about the fact that cows will go over from the Klamath and eat the forage. And so that would make it so that the rogue permittees would not be able to have their cows be able to use that land. That's not. Thank you very much. Okay. We'll give it two minutes. I don't know how much more time you have. Two minutes. Okay. Thank you, Your Honor. To answer your question, yes, Your Honor, there is information that the Klamath had from the rogue of the damage that was being caused in 2007, 2008, 2009. Their entire argument depends on inserting the word quantitative before the, before mentioning what information is available. But this court has said that qualitative information has to be disclosed in NEPA analyses. In fact, even anecdotal information cannot be rejected. That's the Northwest Ecosystems Alliance case. So the information was available. The volunteer reports that Ms. Ying cited are at pages 178 to 211 of the administrative record. There's evidence at pages 358 and 373 of the excerpts of record that those data were in the hands of the Klamath Forest, and yet they didn't disclose them in the EA. It goes to the fundamental problem with the environmental assessment. There's no disclosure of the numbers of cows that have trespassed over the years. There's no disclosure of all of the evidence from the mid-90s and early 2002 at ER 554 complaints about the resource damage that was being caused. None of that is disclosed in the environmental assessment. And I would also quickly just point you to ER 360 where the run of the range management specialists from the Rogue takes issue with the Oak Knoll EA and says, it was not noted to discuss the impacts on the Rogue Forest resources and permittees. It's not just about the permittees impacts. It's the problem in the riparian areas that are still closed to Rogue permittees after all of these decades. The conclusory statement of minimal impacts is not supported by data. This is the quintessential general statement of possible effects and some risk that this court has repeatedly found does not satisfy the hard look standard. Thank you very much. Thank you. The case of Clemmons Field, Wildland Center versus Grantham is submitted. This is the last case of the day. Idaho will gather. Rogue.
judges: Fisher, Berzon, Watford